IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| Ameris Bank,<br><br>   Plaintiff,<br> v.<br><br>Edward Vaughan and Coastal States Bank,<br><br>   Defendants. | Case No. 2:26-cv-01558-RMG<br><br><br>**ORDER** |

Before the Court is Plaintiff's motion for preliminary injunction. (Dkt. No. 9). For the reasons set forth below, the motion is denied.

## I. Factual Background

### A. Plaintiff's Evidence

From July 13, 2020, to January 5, 2026, Defendant Edward Vaughan worked for Plaintiff as a Commercial Banking Marketing Executive. (Dkt. No. 1 at ¶ 2). By virtue of his position, Vaughan had access to confidential information and trade secrets belonging to Plaintiff, including customer lists, customer files, pricing information, financial and marketing information, and business methods and procedures. *Id*. at ¶¶ 23-24. As a condition of his employment, Vaughan signed an Agreement which contained obligations requiring him to maintain the secrecy of such material. *Id*. at ¶¶ 23-24. The Agreement also contained a non-solicitation provision, which stated, in relevant part:

> For a period of twelve (12) months after termination of his employment for any reason (whether voluntary or involuntary), Employee agrees that he will not solicit or attempt to solicit any customers or former customers of [Plaintiff] with whom Employee had material contact during the twelve (12) months immediately prior to the conclusion of his employment with [Plaintiff]. For purposes of the preceding sentence, "material contact" shall mean interaction, which takes place in an effort to further a business relationship.

*Id*. at ¶ 25. The Agreement also provided that, "should [Plaintiff] utilize the service of an attorney to enforce the provisions of the Agreement, [Plaintiff] is entitled to recover attorney's fees, costs, and expenses of enforcement in addition to any damages or other remedies." *Id*. at ¶ 26.

During his employment, Vaughan "was representing [Plaintiff] in conjunction with a credit line transaction with Client 1 . . . ." *Id*. at ¶ 33. According to Plaintiff, Vaughan "deliberately delayed finalizing" the transaction's terms before terminating his employment with Plaintiff and joining Defendant Coastal States Bank ("CSB") in January 2026. *Id*. at ¶¶ 3, 33. Immediately after joining CSB, Vaughan "actively solicited Client 1 to obtain a credit line with [CSB] at more favorable terms than [Plaintiff] was offering at that time," violating the terms of the Agreement. *Id*. at ¶ 34. The Complaint alleges that Vaughan "knew the terms that [Plaintiff] was offering to Client 1 because [he] was directly involved in those prior discussions," and "leveraged that knowledge to craft a competing offer designed to steal the customer . . . ." *Id*. at ¶ 36. These purportedly better terms were offered to Client 1 when Vaughan and executives of CSB visited Client 1's office to make a sales pitch. *Id*. at ¶ 37. "As a direct result of Defendants' actions, [Plaintiff] was compelled to negotiate a materially different credit line transaction with Client 1 on different, more costly terms." *Id*. at ¶ 38.

In or around February 2026, Plaintiff learned of Vaughan's active solicitation of Client 1. *Id*. at ¶ 42. Accordingly, on February 5, 2026, Plaintiff sent a letter to Defendants, providing formal notice of the violation and demanding that they, among other requests, provide a list of Plaintiff's customers that Vaughan had material contact with during his employment that he had "contacted, solicited, or approached" since terminating his employment with Plaintiff. (Dkt. No. 1-2). In a response letter, Vaughan confirmed that he was aware of his obligations under the Agreement but

2

denied that he had solicited Plaintiff's customers or violated the Agreement in any other way. (Dkt. No. 1-3). He claimed that some of Plaintiff's customers had "reached out to [him] without any action on [his] part prior to such outreach." *Id*. He additionally asserted that "responding to such unsolicited outreach is not a violation of the Agreement, which only prohibits solicitation and attempted solicitation of certain customers." *Id*. CSB also responded to Plaintiff's letter, stating, "To the extent that . . . Vaughan has had any contact with [Plaintiff's] customers with whom he previously had material contact . . . during the last 12 months of his employment with [Plaintiff], such contact was initiated by the customer without . . . Vaugh[a]n having made any effort to solicit the customer." (Dkt. No. 1-4).

Counsel for Plaintiff responded to both letters, explaining that their respective interpretations of the Agreement were incorrect under South Carolina law and reiterating the demand that Vaughan provide responses to its requests for customers that he has interacted with since ending his employment with Plaintiff. (Dkt. No. 1 at ¶ 49). In response, Vaughan stated that Client 1 had contacted him and "asked [him] to specifically bid on the [credit] line." (Dkt. No. 1-6). "[Client 1] instructed [Vaughan] on the details of what [Plaintiff] had offered to [it][,] as [it] had a desire for [Vaughan] to offer an alternative." *Id*. He also acknowledged that another client, Client 2, "called [him] . . . to ask [him] to specifically help [it] with [its] line of credit." *Id*.

Following his admissions regarding Clients 1 and 2, Plaintiff learned that Vaughan "attempted to solicit another . . . customer, Client 3." (Dkt. No. 1 at ¶ 55). "The CEO of Client 3 . . . informed [Plaintiff] that . . . Vaughan contacted him to solicit his business on behalf of [CSB], but that Client 3 declined any business with [CSB]." *Id*. Moreover, representatives of another client—Client 4—"stated affirmatively that they had spoken with . . . Vaughan but had no intention of moving their accounts to him or to his new bank." (Dkt. No. 19 at ¶ 6). Client 4 explained that

Vaughan approached it to "explore whether it would move its business from [Plaintiff] to CSB." (Dkt. No. 18 at ¶ 22).

### B. Defendants' Evidence

Prior to his departure, Vaughan claims that Client 1's president—Vaughan's personal acquaintance and long-time business associate—informed him and Plaintiff that he "needed more capital and more favorable terms to continue business with [Plaintiff]." (Dkt. No. 13-1 at ¶¶ 5, 9-10). Client 1's president also stated that he was receiving competitive offers from other financial institutions. *Id*. at ¶ 10; (Dkt. No. 13-3 at ¶ 7). Vaughan claims that he was unable to complete a deal with Client 1 prior to his departure because of Plaintiff's reluctance to "extend [Client 1's] credit line to the extent requested by [Client 1's president]." (Dkt. No. 13-1 at ¶ 10).

After starting with CSB, Vaughan and Client 1's president "exchanged a series of text messages" regarding non-business-related matters. *Id*. at ¶ 13. "In the course of that exchange, [Vaughan] informed [Client 1's president] that [he] had left [Plaintiff], and that [he] was going to start working at CSB." *Id*. Client 1's president "asked what would happen with [his] line of credit request, and Vaughan told [him] that he put in a good word with [Plaintiff]." (Dkt. No. 13-3 at ¶ 8). Client 1's president emphasized to "Vaughan that [his] relationship was with [Vaughan], not [Plaintiff]." *Id*. Vaughan then informed Client 1 that "he had a non-solicitation agreement with [Plaintiff]," *id*., but "offer[ed] to" set up a meeting with CSB's CEO. (Dkt. No. 13-1 at ¶ 13).

When CSB representatives met with Client 1's president, the meeting was for introductory purposes, and "[n]o business proposals were made, nor were any financial documents shared with CSB." (Dkt. No. 13-2 at ¶ 6; Dkt. No. 13-3 at ¶ 9). Following the meeting, Client 1 sent Vaughan and CSB employees a term sheet provided to it by Plaintiff. *Id*. at ¶¶ 10-11. Thereafter, "CSB, without the involvement of Vaughan, . . . provid[ed] [Client 1] with a term sheet." *Id*. at ¶ 12.

Those terms "varied significantly from other financial institutions, and [Client 1] ultimately chose to remain with [Plaintiff]." *Id*. "To date, [Client 1] is still a customer of [Plaintiff]." *Id*.

Vaughan further avers that Client 2 called him "to arrange a meeting to discuss [Client 2's] line of credit and upcoming curtailment" with CSB's CEO. (Dkt. No. 13-1 at ¶ 14). Vaughan informed Client 2 that he "had changed jobs and would not be able to set up" such a meeting. *Id*. Client 2, however, ultimately met with CSB's CEO, and, like the meeting with Client 1, the discussion did not involve any business proposals or sharing of financial documents. (Dkt. No. 13-2 at ¶ 7). Following the meeting, representatives of CSB, without the involvement of Vaughan, followed up with Client 2, but, to date, CSB has not extended a banking proposal. *Id*. at ¶ 9.

As for Client 3, Vaughan claims that he received a text message from its CEO, "congratulating [Vaughan] on [his] transition from one bank to another." (Dkt. No. 13-1 at ¶ 15). Vaughan "responded cordially, thanking [Client 3's CEO]," but has not spoken to him or any other representative of Client 3 since then. *Id*.

## II.    Procedural Background

On April 14, 2026, Plaintiff filed the Complaint, alleging claims of (1) breach of contract; (2) misappropriation of trade secrets under South Carolina law; (3) misappropriation of trade secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq*.; (4) tortious interference with contractual relations; (5) violation of South Carolina's Unfair Trade Practices Act; and (6) negligent supervision. *See generally* (Dkt. No. 1).

On April 28, 2026, Plaintiff filed this motion for preliminary injunction based on all the causes of action in the Complaint. *See generally* (Dkt. No. 9). Plaintiff requests that the Court (1) enjoin Vaughan, until January 5, 2027, from directly or indirectly soliciting, attempting to solicit, or actively seeking to gain business with customers or former customers he had material contact

during the 12 months before leaving Plaintiff; (2) enjoin Defendants from using, disclosing, or relying upon Plaintiff's confidential, proprietary, or trade secret information for any purpose; (3) require Defendants to identify in writing each of Plaintiff's clients Vaughan had a business-related contact with since January 5, 2026, including whether the initial contact was customer-initiated and the method of that communication; and (4) require CSB to implement and maintain reasonable measures to ensure Vaughan's compliance with his contractual and legal obligations to Plaintiff through the expiration of the restricted period. *Id*.

On May 12, 2026, Defendants filed a joint response (Dkt. No. 13), and on May 19, 2026, Plaintiff replied (Dkt. No. 17).

This matter is now ripe for disposition.

## III.    Legal Standard

"Preliminary injunctions are extraordinary remedies involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances." *Salomon & Ludwin, LLC v. Winters*, 150 F.4th 268, 273 (4th Cir. 2025) (citation and punctuation omitted). To prevail, a plaintiff must show: (1) likelihood of success on the merits; (2) likelihood of irreparable harm absent preliminary relief; (3) equity favors granting preliminary relief; and (4) preliminary relief is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (citation omitted). The plaintiff must make a "clear showing" on all four factors. *See id.* at 22 (citation omitted). Accordingly, "a district court is entitled to deny preliminary injunctive relief on the failure of any single *Winter* factor, without fully evaluating the remaining factors." *Vitkus v. Blinken*, 79 F.4th 352, 361 (4th Cir. 2023) (citation omitted).

IV.     **Discussion**

The Court need not address whether Plaintiff has clearly shown a likelihood of success on the merits, that the balance of equities tips in its favor, or that an injunction is in the public interest, because Plaintiff has failed to clearly show that it is likely to suffer irreparable harm absent preliminary relief.

Plaintiff argues that it is likely to suffer irreparable harm because "[its] injury—loss of customers, erosion of relationships with those customers, and the reasonable prospect of lost goodwill by virtue of Defendants' improper solicitation—is ongoing, immediate, and of a type that courts consistently recognize as subjecting parties to irreparable harm." (Dkt. No. 9-1 at 22). It further argues that "Defendants' misappropriation of proprietary customer strategies, pricing information, methodologies, and other confidential information, may result in not just the loss of a present opportunity but also future opportunities, and cross-selling relationships that cannot be measured in real-time or undone by a later damages award." *Id*. at 23. The immediacy of the harm, Plaintiff contends, is underscored by Defendants' attempts to acquire at least four of Plaintiff's clients and is not undermined by waiting two months to seek an injunction because the "[f]iling occurred only after Ameris learned additional facts that heightened concern about ongoing misconduct." (Dkt. No. 17 at 13-14). Finally, Plaintiff asserts that it is not necessary to show that its clients were successfully converted to be awarded relief, as the potential loss of customers is sufficient to show the likelihood of irreparable harm. *Id*. at 14.

In response, Defendants argue that Plaintiff's injuries are entirely speculative and fully compensable through monetary damages. (Dkt. No. 13 at 20). Further, according to Defendants, the Agreement belies any claim that Plaintiff will suffer irreparable harm because the contract contemplates a comprehensive damages remedy that the parties themselves bargained for,

7

demonstrating that monetary relief was understood by both parties to be an adequate remedy for breach. *Id*. They additionally contend that Plaintiff did not act with reasonable diligence by waiting two months from the time it learned of the alleged violations to seek an injunction, weakening any claim that Plaintiff faces ongoing and imminent harm. *Id*. at 22.

"Generally, irreparable injury is suffered when monetary damages are difficult to ascertain or are inadequate." *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551 (4th Cir. 1994) (citation and punctuation omitted), *abrogated on other grounds by Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008). "[I]rreparable harm must be neither remote nor speculative, but actual and imminent." *Direx Isr., Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991) (citation and punctuation omitted). While the Fourth Circuit has recognized that "the threat of a permanent loss of customers and the potential loss of goodwill . . . support[s] a finding of irreparable harm," *Multi-Channel*, 22 F.3d at 552 (citation omitted), it has not held that damages from improper solicitation will always be irreparable.

Indeed, a breach of contract may sometimes result in the loss of future business opportunities and damage to a party's goodwill. But allegations of such harms, without concrete evidence demonstrating that they are actual, imminent, and incapable of adequate compensation through monetary damages, cannot alone justify the extraordinary remedy of a preliminary injunction. *See Winter*, 555 U.S. at 22 ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.") (citation omitted). Thus, absent specific and persuasive evidence demonstrating that the plaintiff will suffer irreparable harm in the absence of a preliminary injunction—for example, where the alleged harm is difficult to calculate or otherwise incapable of adequate compensation through

8

monetary damages—the plaintiff is not entitled to such extraordinary relief. *See, e.g., Multi-Channel*, 22 F.3d at 552.

Here, Plaintiff fails to make a clear showing of irreparable harm. It offers no evidence of loss of goodwill, damage to its reputation, or the past loss of a single customer to CSB based on Vaughan's alleged solicitation. *See Direx*, 952 F.2d at 812 (providing that irreparable harm must be "neither remote nor speculative, but actual and imminent") (citation omitted). Moreover, Plaintiff fails to offer any evidence demonstrating imminent future harm. Beyond speculation and conjecture, Plaintiff has not shown that Defendants are currently in possession of Plaintiff's customer lists or other confidential information, making it less likely that failing to enter an injunction will result in the loss of future customers. *Cf. Variable Annuity Life Ins. Co. v. Coreth*, 535 F. Supp. 3d 488, 517 (E.D. Va. 2021) (granting motion for preliminary injunction, in part, because threat of future loss of customers was imminent where the defendant was still in possession of the plaintiff's trade secrets).

Plaintiff likewise fails to establish that monetary damages would be an inadequate remedy. On the present record, the only concrete loss Plaintiff identifies as resulting from Vaughan's alleged solicitation is that it was required to extend a credit line to Client 1 on less favorable terms. (Dkt. No. 1 at ¶ 38). Plaintiff has presented no evidence that this transaction harmed its reputation or goodwill with Client 1 or any other customer. To the contrary, the Court finds that any damages arising from this transaction are readily quantifiable and capable of being fully compensated through an award of monetary damages, particularly where there is no evidence that Plaintiff has lost a single client.

Thus, although a client cannot be "unsolicited," *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley*, 756 F.2d 1048, 1054 (4th Cir. 1985), and the loss of a client may in some

circumstances constitute irreparable harm, Plaintiff has failed to present evidence showing that it has suffered, or is likely to suffer, actual and imminent harm that cannot be adequately remedied through monetary damages. Plaintiff has not demonstrated that it has suffered unascertainable damages, that future harm is likely to occur, or that any such harm would be irreparable. Accordingly, Plaintiff has failed to carry its burden of clearly establishing irreparable harm, and its motion for preliminary injunctive relief must be denied.

## V.     Conclusion

For the foregoing reasons, Plaintiff's motion for preliminary injunction (Dkt. No. 9) is **DENIED**.

**AND IT IS SO ORDERED.**

s/ Richard Mark Gergel
Richard Mark Gergel
United States District Judge

June 24, 2026
Charleston, South Carolina